OPINION
{¶ 1} Defendant-appellant Dean Dillon appeals his conviction on multiple charges of robbery, burglary and theft in the Delaware County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On November 10, 2003, Anthony DeVictor pulled into the driveway of his mother's residence and noticed a parked red Kia. Upon entering the house, he observed the garage door was open, and an unknown adult male wearing a bandana in the kitchen with his mother's wallet and a pillowcase in his hand.
 {¶ 3} DeVictor confronted the man and they engaged in a brief altercation. The man eventually fled the scene. DeVictor called the dispatcher and reported the man's license plate number.
 {¶ 4} Eventually, Delaware County Sheriff's detectives identified two individuals in possession of the red Kia-appellant and his friend, Richard Flanagan. The detectives obtained a BMV photo of appellant, and used the photo in a line-up, with appellant's photo marked as "photo number 3." DeVictor identified appellant's photograph as the photo best describing the man he saw in his mother's kitchen "as far as build and facial features" from the photo line-up. DeVictor told the detectives the man in his mother's kitchen wore a bandana and did not have an eyebrow ring. The detectives covered the top of appellant's photo, and DeVictor stated photo number 3 definitely looked like the man he saw in his mother's kitchen.
 {¶ 5} On November 23, 2003, appellant was indicted on multiple charges of robbery, burglary and theft. On the same day, a request for issuance of warrant and indictment was issued. On November 25, 2003, appellant was jailed in the Franklin County Jail on unrelated charges. Appellant admits he was informed of a felony holder issued by the Delaware Sheriff's Office. However, appellant was not personally served with the warrant.
 {¶ 6} On January 28, 2004, appellant was released from the Franklin County Jail and transferred to the Ohio Corrections Reception Center in Orient, Ohio. The parties stipulate a certified copy of the warrant on indictment was sent to C.R.C. on January 29, 2004. On February 4, 2004,[1] Detective Brian Blair of the Delaware County Sheriff's Office faxed a copy of the warrant and the indictment to the C.R.C. requesting the same be served on appellant. Again, appellant was not personally served with either the warrant or indictment.
 {¶ 7} At the end of February, beginning of March, 2004, Appellant was transferred to Pickaway Correctional Institution. Pickaway acknowledged appellant's record showed an outstanding warrant from Delaware County. A "wanted detainer" was listed in appellant's record in accordance with standard procedure. Appellant's signature appears on the wanted detainer, dated April 13, 2004.
 {¶ 8} On April 16, 2004, appellant was transported back to the Franklin County Jail, and again he was not served with the Delaware County warrant. On August 13, 2004, appellant was conveyed to Delaware County and served with a copy of the indictment.
 {¶ 9} On August 30, 2004, appellant filed a motion to dismiss due to a speedy trial violation. On September 17, 2004, appellant filed a motion to suppress. The trial court conducted a hearing on both motions on October 25, 2004, and denied both motions.
 {¶ 10} On October 26, 2004, appellant filed a motion for a continuance of the trial scheduled for November 2, 2004. The trial court denied the motion. Thereafter, appellant entered a plea of no contest to the burglary charge, and the State dismissed the remaining charges. The trial court sentenced appellant to seven years incarceration.
 {¶ 11} Appellant now appeals, assigning as error:
 {¶ 12} I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING THE DEFENDANT'S MOTION FOR THE DISMISSAL OF THE INDICTMENT BASED UPON THE VIOLATION OF HIS RIGHT TO A SPEEDY TRIAL.
 {¶ 13} II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE RELATING TO A PHOTO LINE-UP.
 {¶ 14} III. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S FIRST MOTION FOR A CONTINUANCE OF THE DATE SCHEDULED FOR JURY TRIAL.
 I {¶ 15} In the first assignment of error, appellant argues the trial court erred in denying his motion to dismiss the indictment based upon a violation of his right to a speedy trial. We agree.
 {¶ 16} Specifically, appellant maintains his right to a speedy trial was violated by the State's failure to afford him an opportunity to make a written request for final disposition within 180 days pursuant to R.C.2941.401.
 {¶ 17} Section 2941.401 reads:
 {¶ 18} "When a person has entered upon a term of imprisonment in a correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, he shall be brought to trial within one hundred eighty days after he causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter, except that for good cause shown in open court, with the prisoner or his counsel present, the court may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the warden or superintendent having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time served and remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the adult parole authority relating to the prisoner.
 {¶ 19} "The written notice and request for final disposition shall be given or sent by the prisoner to the warden or superintendent having custody of him, who shall promptly forward it with the certificate to the appropriate prosecuting attorney and court by registered or certified mail, return receipt requested.
 {¶ 20} "The warden or superintendent having custody of the prisonershall promptly inform him in writing of the source and contents of anyuntried indictment, information, or complaint against him, concerningwhich the warden or superintendent has knowledge, and of his right tomake a request for final disposition thereof.
 {¶ 21} "Escape from custody by the prisoner, subsequent to his execution of the request for final disposition, voids the request.
 {¶ 22} "If the action is not brought to trial within the timeprovided, subject to continuance allowed pursuant to this section, nocourt any longer has jurisdiction thereof, the indictment, information, or complaint is void, and the court shall enter an order dismissing theaction with prejudice.
 {¶ 23} "This section does not apply to any person adjudged to be mentally ill or who is under sentence of life imprisonment or death, or to any prisoner under sentence of death"
 {¶ 24} R.C. § 2941.401 (Emphasis added.)
 {¶ 25} Appellant testified on October 25, 2004, at a hearing before the trial court regarding this issue:
 {¶ 26} "Q. At any point during the time that you were at the Franklin County Jail, at C.R.C. or at Pickaway Correctional Facility, were you served with a copy of the indictment in this case?
 {¶ 27} "A. No, sir.
 {¶ 28} "Q. Did you ever get a copy of it, whether it was by service or otherwise?
 {¶ 29} "A. No, sir.
 {¶ 30} "Q. While you were at the Franklin County Jail, you were visited by the Delaware County Sheriff and Prosecutor regarding this case; is that correct?
 {¶ 31} "A. Yes, sir.
 {¶ 32} "Q. Do you remember the date, the first date where someone visited you there regarding this case?
 {¶ 33} "A. December 4th, of 2003.
 {¶ 34} "Q. Who showed up?
 {¶ 35} "A. Two detectives.
 {¶ 36} "Q. Do you remember the detectives' names?
 {¶ 37} "A. Just Blair, because he was on the reports I got. The other gentleman, I can't remember his name.
 {¶ 38} "Q. Did they have a copy of the indictment to serve on you at the time they showed up?
 {¶ 39} "A. No, sir.
 {¶ 40} "Q. Was the purpose of the visit to ask you questions about this case?
 {¶ 41} "A. Yes, sir.
 {¶ 42} "Q. And at that time did you request that an attorney be present?
 {¶ 43} "A. Yes, sir.
 {¶ 44} "Q. And was the request honored?
 {¶ 45} "A. Yes, sir. Well, I mean they quit interviewing me. Took me back upstairs.
 {¶ 46} "Q. So they stopped interviewing you?
 {¶ 47} "A. Yes, sir.
 {¶ 48} "Q. Then did they come back on another day?
 {¶ 49} "A. Detective Blair and the Assistant Prosecutor came back on January 28th.
 {¶ 50} "Q. January 28th. Was that at C.R.C?
 {¶ 51} "A. No. That was the day I was going from Franklin County to C.R.C.
 {¶ 52} "Q. Based on your conversations with them, were they aware that you were going to C.R.C. the following day?
 {¶ 53} "A. No, I went the same day they came.
 {¶ 54} "Q. The same day. So were they aware that you were going that same day?
 {¶ 55} "A. Yes, sir.
 {¶ 56} "Q. At the time that they came to meet you on January 28th, 2004, did they bring a copy of the indictment to serve on you?
 {¶ 57} "A. No, sir.
 {¶ 58} "Q. Did you request that an attorney be present for that meeting —
 {¶ 59} "A. Yes, sir.
 {¶ 60} "Q. — Meeting with the Prosecutor and the Sheriff, Sheriff's Deputy?
 {¶ 61} "A. Yes Sir.
 {¶ 62} "Q. And was that request honored?
 {¶ 63} "A. Well, they stopped interviewing me.
 {¶ 64} "Q. They stopped the interview at that time?
 {¶ 65} "A. Yes, sir.
 {¶ 66} "Q. When did you first see a copy of the indictment; was it here at the arraignment.
 {¶ 67} "A. Yes, sir.
 {¶ 68} "Q. Last August?
 {¶ 69} "A. August, yes, sir."
 {¶ 70} Tr. at p. 6-8.
 {¶ 71} Subsequently, on cross-examination by the Assistant Prosecutor, appellant testified:
 {¶ 72} "Q. So on April 9th, 2004 you were aware that Delaware County had a warrant out for you; correct?
 {¶ 73} "A. I was aware January — January 31st of 2004, I was aware of the detainer from Delaware.
 {¶ 74} "Q. And we also came to talk to you about the incident involving the robberies in Delaware County; correct?
 {¶ 75} "A. January 28th and December 4th of 2003.
 {¶ 76} "Q. So, twice representatives from Delaware County talked to you about the warrants out of Delaware County; correct?
 {¶ 77} "A. Yes, ma'am.
 {¶ 78} "Q. And I specifically talked to you about, once you get into the prison system, the warrant has paperwork for you to fill out to trigger the 180 day time period for which to be served with the known detainer; do you remember that conversation?
 {¶ 79} "A. No.
 {¶ 80} "Q. Okay. And do you remember me explaining to you, because we didn't know which prison you were going to, we couldn't serve you yet?
 {¶ 81} "A. No.
 {¶ 82} "Q. You don't remember any of that discussion?
 {¶ 83} "A. The discussion I remember is you and Mr. Blair was sitting at the bench when I came in and you told me that you were the Assistant Prosecutor, and that you wanted to make a deal with me, because you wanted a co-defendant, a supposed co-defendant. And I asked for representation and you got up and walked away. And I asked you for a copy of the indictment, and I told you that I was leaving for C.R.C. and you asked Mr. Blair, why haven't I received a copy of the indictment yet.
 {¶ 84} "Q. And then I explained to you that once you got to the prison system, the Warden was to explain to you what you were being held on, the outstanding warrants, and it was up to you to trigger paperwork for the Prosecutor's Office?
 {¶ 85} "A. No, ma'am.
 {¶ 86} "Q. You don't remember that?
 {¶ 87} "A. No, ma'am.
 {¶ 88} "Q. There's no question, though, that by April, 2004, you had known about the warrant out of Delaware County for months: correct?
 {¶ 89} "Mr. Uhrich: Objection.
 {¶ 90} "The Court: Overruled.
 {¶ 91} "By Ms. Hemmeter:
 {¶ 92} "Q. You knew about the warrant, though, from Delaware County, correct?
 {¶ 93} "A. No. I knew about the warrant February 9th — I mean March 9th, April 9th, whenever I signed for the warrant from Pickaway.
 {¶ 94} "Q. And yet you never triggered paperwork to the Delaware County Prosecutor's Office to trigger the 180 day time period; correct?
 {¶ 95} "A. I thought I did the day I talked to you.
 {¶ 96} "Q. Did you fill out any paperwork and sent it to the Prosecutor's Office?
 {¶ 97} "A. I didn't think I needed to. You was there representing the indictment.
 {¶ 98} "Q. And that you knew about the indictment was back in January, 2004?
 {¶ 99} "A. No, I didn't know about the indictment. I was threatened with an indictment, but I never knew that one existed.
 {¶ 100} "Q. Even though we offered you a plea deal at that time, you did not think we were talking about an indictment that already existed?
 {¶ 101} "A. Huh-uh."
 {¶ 102} Tr. at p. 11-14.
 {¶ 103} On direct examination by appellant's counsel, Detective Brian Blair testified:
 {¶ 104} "Q. For this portion of the hearing my questioning will be very brief. Show you a page out of our Defendant's Exhibit A, if you count the number of pages in, it's the ninth page. It's a fax cover sheet. The date on the fax cover sheet is January, it's says on the face, January 4th, 2004
 {¶ 105} "A. Correct.
 {¶ 106} "Q. My guess is it's supposed to say February 4th, 2004.
 {¶ 107} "A. Correct.
 {¶ 108} "Q. Could you describe for the court what the page is; what the text is on it and just what the purpose of the fax was?
 {¶ 109} "A. It's a fax cover sheet which we put on of our faxes and I faxed this particular piece of paper to Stacey, who works at C.R.C., asking her to serve Dean Dillon with the warrant.
 {¶ 110} "Q. Do you know Stacey's last name?
 {¶ 111} "A. I just found out this morning, Blankenberg.
 {¶ 112} "Q. Okay. Stacey Blankenberg?
 {¶ 113} "A. Right.
 {¶ 114} "Q. And you faxed it to her for the purpose of her making arrangements to have Mr. Dillon served with the indictment?
 {¶ 115} "A. Officially served.
 {¶ 116} "Q. Did you ever get a response from Stacey?
 {¶ 117} "A. No, I did not. I made several phone calls to her where she said that she would do that.
 {¶ 118} "Q. What's your understanding of how the process works once Stacey receives a fax from you; how the process of serving —
 {¶ 119} "A. The way she explained it to me was that she would serve him. However, she did not have to serve him until his term was over and being transferred to our agency on our detainer is what she stated to me.
 {¶ 120} "Q. She called you, or you had conversations with her after faxing this to her?
 {¶ 121} "A. Yes, sir. Once to make sure she got the fax and then to ask if it had been done, which she said that she had not done it yet.
 {¶ 122} "Q. But she had received the fax?
 {¶ 123} "A. Yes.
 {¶ 124} "Q. And the copy of the indictment and the warrant?
 {¶ 125} "A. Correct."
 {¶ 126} Tr. at 19-20.
 {¶ 127} On cross-examination by the prosecutor, Detective Blair testified:
 {¶ 128} "Q. Do you remember me explaining to him the process by which he could be served with his warrant while in prison?
 {¶ 129} "A. Yes, I did.
 {¶ 130} "Q. Did I explain to him that there was paperwork that he had to file with the prosecutor's office to trigger the 180 days time period?
 {¶ 131} "A. Yes, I do and I remember that because we did not know he was being transferred to C.R.C. and we were rushing to make sure that he knew exactly what needed to be done.
 {¶ 132} "Q. Okay. At that point, we didn't know he was going to Pickaway; Correct?
 {¶ 133} "A. We didn't know where he was going.
 {¶ 134} "Q. But we did advise him that there was an indictment and that he had to trigger the 180 days time period himself?
 {¶ 135} "A. Yes, ma'am."
 {¶ 136} Tr. at 21-22.
 {¶ 137} Following the October 25, 2004 hearing, the trial court made the following findings on the record:
 {¶ 138} "Regarding the dismissal motion, the records are clear that Mr. Dillon was advised at least once, if not twice in person regarding the indictment. He wasn't sure whether he could believe what he was being told as to whether there was an actual indictment or a threat of an indictment, but never-the-less, he was told of the indictment. No service of the indictment was made either at the time Detective Blair went down to talk to him. Why I'm not entirely sure. Probably should have been. He was advised by the Assistant County Prosecutor, Hemmeter, of this requirement that he needed to send something to the court demanding trial within 180 days. Detective Blair testified he did fax to C.R.C. or Stacey, whether it was C.R.C., maybe it was Pickaway Institution to serve — He gave notice of the holder and she said she would serve Mr. Dillon, but she wasn't required to until he left the institution. In any event, he was notified at the time regarding the indictment because he signed the document, the detainer. He was notified of the detainer on April 9th, 2004. Otherwise there was no service of the indictment, of course, until Mr. Dillon appeared here at the time of the arraignment.
 {¶ 139} "The defense argues that there was a duty on this court to notify Mr. Dillon and that did not occur. Otherwise, the statute is worthless unless the inmates get served. The State argues that the Hariston [sic] puts the duty on the defendant once he's aware of the indictment. And he was aware of the indictment for sure April 9th of 2004, but he was aware of the indictment in the discussion earlier by the detective and by the prosecutor.
 {¶ 140} "So, based on the Hariston [sic] case, the Court would deny the motion to dismiss on time because the defendant did not comply with the statute and demand that he be tried within the 180 day requirement, the statute being 2941.401."
 {¶ 141} Tr. at p. 76-78.
 {¶ 142} The trial court cited and relied upon the Ohio Supreme Court decision in State v. Hairston (2004), 101 Ohio St.3d 308, in denying appellant's motion to dismiss. The question on appeal in Hairston was whether R.C. 2941.401 places a duty of reasonable diligence on the state to discover the whereabouts of an incarcerated defendant against whom charges are pending.
 {¶ 143} In Hairston, the Franklin County Prosecuting Attorney charged Hairston by information with aggravated robbery, kidnapping and two counts of robbery. On October 6, 2000, the prosecutor dismissed those charges, anticipating a possible indictment. On October 18, 2000, the grand jury indicted Hairston on the same charges, and filed them on October 25, 2000.
 {¶ 144} Because of the charges in the information, Hairston's parole officer held an on-site parole revocation hearing and revoked his parole on October 24, 2000. A summons sent to Hairston's home, while he remained in the county jail, came back unserved. On October 31, 2000, Hairston was returned to the custody of the Ohio Department of Rehabilitation and Correction.
 {¶ 145} On June 12, 2001, the records supervisor at the Pickaway Correctional Institution delivered a detainer to Hairston advising him of the four charges from the October 2000 indictment.
 {¶ 146} The Supreme Court concluded Hairston never caused the requisite notice of imprisonment and request for final disposition to be delivered to either the prosecuting attorney or the court; therefore, he never triggered the process to cause him to be brought to trial within 180 days of his notice and request. The Court further concluded the facts revealed the warden did not have knowledge of any of the charges pending against him, and the statute does not require a duty of reasonable diligence for the State to discover the whereabouts of an incarcerated defendant against whom criminal charges are pending.
 {¶ 147} The Supreme Court held:
 {¶ 148} "In its plainest language, R.C. 2941.401 grants an incarcerated defendant a chance to have all pending charges resolved in a timely manner, thereby preventing the state from delaying prosecution until after the defendant has been released from his prison term. It does not, however, allow a defendant to avoid prosecution simply because the state failed to locate him. The facts here demonstrate that Hairston knew of his arrest, knew he had been apprehended in the bar, and knew that the police had removed from his waistband the money taken from the blue bag during the robbery. He also knew that the prosecutor had charged him by information; despite this, he waited until June 2001 to seek to enforce R.C. 2941.401."
 {¶ 149} Unlike Hairston, in the case sub judice, there is clear evidence the State knew the location where appellant was incarcerated, and properly served the facilities in which appellant was incarcerated. The parties stipulate a certified copy of the warrant on indictment was sent to C.R.C. on January 29, 2004. Appellant also introduced as evidence at trial the February 4, 2004 facsimile from Detective Blair to C.R.C., requesting appellant be served with a copy of the warrant and indictment. At that point, the statute affirmatively required the warden or superintendent having custody of the appellant to promptly inform himin writing of the source and contents of the indictment, and of his right to make a request for final disposition thereof. Unlike the situation inHairston where the State had no actual knowledge of the defendant's whereabouts, in the case sub judice, the State had actual knowledge, and delivered the requisite charging instrument to the warden of the facility wherein appellant was incarcerated. The warden or superintendent at C.R.C. failed to deliver it to the appellant. We find this factual difference renders Hairston distinguishable and therefore inapplicable.
 {¶ 150} In State v. Fitch, April 1, 1987, Coshocton App. No. 85-CA-40, this Court held:
 {¶ 151} "R.C. 2941.401 provides that, when properly notified, an inmate of a state correctional institution has a right to demand trial of an untried indictment within one hundred eighty days of the service of his request. The record reveals that the appellant was incarcerated in a state correctional institution from June 8, 1984 until March 22, 1985. The appellant was indicted by the Coshocton County Grand Jury on October 31, 1984. The Coshocton County Sheriff's Department sent the warrant on the indictment to the Lebanon Correctional Institute on November 1, 1984, and the institution acknowledged receipt of the warrant on November 21, 1984. Although the appellant did receive a copy of a letter wherein the institution in which he was incarcerated acknowledged receipt of a letter from the Coshocton County Sheriff's Department stating that appellant would be taken into custody upon his release, the record is clear that appellant did not receive notice of his specific right under R.C. 2941.401 `to make a request for final disposition' of the pending indictment.
 {¶ 152} "The state legislature, in its wisdom, has elected to obligate the state to notify the accused of his right to make a demand for speedy disposition of pending indictments as well as the fact of such indictments. It would nullify the entire purpose of the statute if failure to give notice of the right would operate to relieve the state of its legal burden to try cases within rule.
 {¶ 153} "Absent such specific advice, the state cannot rely upon the prisoner's failure to make demand for speedy disposition but must count the time as having commenced upon the first triggering of the state's duty to give notice of the right to make demand for speedy disposition.State v. Floyd (Oct. 25, 1979), Cuyahoga App. No. 39929, unreported;State v. Carter (June 30, 1981), Franklin App. No. 80AP-434, unreported."
 {¶ 154} Upon review of the record, there is no affirmative evidence appellant was informed in writing of the source and contents of the indictment as required by R.C. 2941.401, despite ample evidence the location where appellant was incarcerated (C.R.C.) had been provided notice of the indictment. To allow the State to benefit from the warden's or superintendent's failure to perform his or her statutory duty to inform appellant in writing of the source and contents of the indictment and his right to request final disposition thereof would circumvent the entire purpose of the statute and relieve the State of its legal burden to try cases within the rule. Pursuant to Fitch, we find appellant's speedy trial time calculation commenced at the latest on February 4, 2004. Pursuant to R.C. 2941.401, no court has jurisdiction over this matter any longer, and the action shall be dismissed with prejudice.
 {¶ 155} Therefore, we sustain appellant's first assignment of error, and we reverse appellant's conviction based upon a violation of his speedy trial rights.
 II III {¶ 156} Due to our disposition of appellant's first assignment of error, we find appellant's remaining assignments of error moot.
 {¶ 157} Appellant's conviction in the Delaware County Court of Common Pleas is reversed.
By: Hoffman, J., Gwin, P.J. and Farmer, J. concur.
[1] The fax cover sheet included in Defendant's Exhibit A introduced at trial was dated January 4, 2004. However, upon review of the transcript at page 19, we understand the correct date to be February 4, 2004.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Delaware Court of Common Pleas is reversed. Costs assessed to appellee.